UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SCOTT CRAWFORD                                              PLAINTIFF

VS.                                    CIVIL ACTION NO. 3:17CV118TSL-RHW

HINDS COUNTY, MISSISSIPPI                                   DEFENDANT


MEMORANDUM OPINION AND ORDER

Plaintiff Scott Crawford is a disabled individual who uses a
motorized wheelchair.  He brought the present action against Hinds
County under Title II of the Americans with Disabilities Act, 42
U.S.C. § 12131 *et seq.* (ADA), as well as the Rehabilitation Act,
29 U.S.C. § 794 *et seq.*, charging that the Hinds County Courthouse
is not readily accessible to the disabled because of numerous
mobility-related architectural barriers throughout the courthouse.
In his complaint, plaintiff requested injunctive relief, monetary
damages, as well as attorneys' fees and costs.

Previously in this cause, the court denied a motion by Hinds
County for summary judgment and granted, in part, plaintiff's
cross-motion for partial summary judgment.  The County asserted in
its motion, among other arguments, that plaintiff's complaint was
due to be dismissed on the basis that he lacked standing under
Article III of the United States Constitution.  In its order, the
court found that plaintiff has standing to pursue his claims in
this case.  That was true as to his claim for damages, but that
claim was settled between the parties.  In the course of
evaluating evidence presented at the trial of the case, the court

has reexamined the issue of standing[1] and become convinced that he has no standing to obtain an injunction.  His claim for injunctive relief must therefore be dismissed.

ADA Title II/Rehabilitation Act

The ADA, passed by Congress in 1992 to address discrimination against disabled individuals, contains three separate titles which prohibit discrimination, respectively, in employment (Title I), public services and transportation (Title II), and public accommodations (Title III).  Plaintiff's complaint involves Title II, which states:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

42 U.S.C. § 12132.

Section 504 of the Rehabilitation Act, which applies to recipients of federal funding, provides, like Title II, that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The ADA and the Rehabilitation Act generally are interpreted *in pari materia*.  Frame v. City of Arlington, 657 F.3d 215, 223 (5th

---

[1]    See Louisiana Sportsmen All., L.L.C. v. Vilsack, 583 F. App'x 379, 380 (5th Cir. 2014) (issue of Article III standing may be raised by the court *sua sponte*, at any time).

Cir. 2011). While the ADA does not define the "services, programs, or activities of a public entity", the Rehabilitation Act's definition of a "program or activity" as "all of the operations of ... a local government" applies under the ADA. Id. at 225.

The parties agree that plaintiff is a "qualified individual with a disability" and that Hinds County is a "public entity" subject to the requirements of Title II. It is further undisputed that Hinds County is a recipient of federal funds and subject to § 504 of the Rehabilitation Act.

The ADA's implementing regulations state that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.149. A public entity is required to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). While this means that a public entity must take reasonable measures to remove architectural and other barriers to accessibility, "Title II does not require [a public entity] to employ any and all means to make [its programs, services and activities] accessible to persons with disabilities... It

3

requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided...." Tennessee v. Lane, 541 U.S. 509, 511, 124 S. Ct. 1978, 1981, 158 L. Ed. 2d 820 (2004). Standards for determining compliance with this obligation differ based on whether the facility was built and/or altered before or after the ADA took effect in January 1992. See Greer v. Richardson Indep. Sch. Dist., 472 F. App'x 287, 295 (5th Cir. 2012). For facilities built or altered after 1992, ADA regulations require compliance with specific architectural accessibility standards, known as the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Ch. 1, Pt. 36, App. A. Tennessee v. Lane, 541 U.S. at 531-32, 124 S. Ct. 1978 (citing 28 CFR § 35.151 (2003)).[2] However, in recognition of the reality that in the case of existing facilities, a public entity would have difficulty meeting all of the technical requirements of the ADAAG, the ADA's implementing regulations provide "less stringent and more flexible" accessibility requirements for existing facilities than for new facilities. Greer, 472 F. App'x at 291. In summary,

---

[2] Under the Rehabilitation Act, buildings constructed with federal funds are governed by a nearly identical set of standards, the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R., Pt. 101-19.6, App. A. See Greer v. Richardson Indep. Sch. Dist., 472 F. App'x 287, 291 (5th Cir. 2012). Under Title II, public entities may comply with either set of standards. Id. (citing 28 C.F.R. § 35.151).

4

> in the case of older facilities, for which structural
> change is likely to be more difficult, a public entity
> may comply with Title II by adopting a variety of less
> costly measures, including relocating services to
> alternative, accessible sites and assigning aides to
> assist persons with disabilities in accessing services.
> § 35.150(b)(1). Only if these measures are ineffective
> in achieving accessibility is the public entity required
> to make reasonable structural changes. <u>Ibid</u>. And in no
> event is the entity required to undertake measures that
> would impose an undue financial or administrative
> burden, threaten historic preservation interests, or
> effect a fundamental alteration in the nature of the
> service. §§ 35.150(a)(2), (a)(3).

<u>Lane</u>, 541 U.S. at 532, 124 S. Ct. 1978. In all events, though, a public entity has a duty to "ensure that individuals with disabilities receive the benefits or services provided by the public entity" and thus to ensure that each service, program, or activity at its courthouse, "when viewed in its entirety," is readily accessible to individuals with disabilities. <u>Shotz v. Cates</u>, 256 F.3d 1077, 1080 (11th Cir. 2001).

<u>Plaintiff's Experiences at the Hinds County Courthouse</u>

Plaintiff has multiple sclerosis. Because of the symptoms caused by this disease, he relies on a motorized wheelchair for mobility. In December 2006, as his symptoms began progressing, plaintiff, who was living in Florida at the time, decided to move back to Mississippi so that he could have help from his family in Mississippi. Promptly upon returning to Mississippi, plaintiff went to the Hinds County Courthouse (the courthouse) to register to vote. He found that he could not enter the main entrance at the front of the building because of multiple steps leading to the

entrance.  There was no sign directing him to an accessible entrance, but after looking around, he found a floor-level entrance on the east side of the building.  However, he required assistance to enter the building because the doors were heavy and the door handles were of a type that required tight grasping and twisting to operate, which he was unable to do.  Once inside the building, plaintiff went to the Circuit Clerk's office, located on the ground level, and completed his voter registration.

Plaintiff subsequently returned to the courthouse some six years later, in October 2012, when he was summoned for jury duty by the Hinds County Circuit Court.  He knew from his earlier experience to go to the east entrance; but for the same reasons as before, he had difficulty actually entering the building.  Someone had to open the doors for him.  After entering, he took the elevator to the second floor and located the courtroom where jury selection was taking place.  Upon entering the courtroom, he found the pews in the gallery had no wheelchair cutouts to accommodate his wheelchair.  He did not want to sit in the aisle because it seemed narrow and he did not want to block others or pose a trip hazard.  There was an open space in the back but he has issues with his vocal cords and thought it might be difficult for him to be heard.  Eventually he decided to sit in front of all the pews, to the right of the judge.

While waiting for jury selection to begin, plaintiff went to the second floor men's restroom. A sign on the door indicated it was an accessible restroom, but it was immediately obvious to him that the restroom was not ADA-compliant as it had a door knob that required tight grasping and twisting. When he actually entered the restroom, he discovered the stall was too narrow to accommodate his wheelchair and he was not able to use the restroom. Instead, he was wearing incontinence undergarments and had to relieve himself in his pants.

That day, the jury venire was dismissed with instructions to come back on Wednesday. Because he had learned that the second floor men's restroom was not accessible, on Wednesday, when he needed to use the restroom, he asked a bailiff where there was an accessible restroom. In response, the bailiff guided him through "several locked doors" to a unisex restroom that, while not fully ADA-compliant, was large enough to accommodate his wheelchair. The bailiff waited outside the door until plaintiff was finished and then escorted him back to the courtroom.

As jury selection progressed, the judge asked venire members to approach the bench if they had concerns about serving on the jury. Plaintiff, however, was not able to approach the judge because a six-inch step separated the gallery from the bar/bench area. As he had no means of navigating the step, he raised his hand and a bailiff came to him. He told the bailiff, who in turn

told the judge, that he would like to serve on the jury but could only serve if it were going to be a short trial because he was limited in how long he could sit in his wheelchair. The bailiff relayed this information to the judge, and plaintiff was excused.

Upon leaving the courthouse, plaintiff went directly across the street to the Chancery Court building, which houses the County's administrative offices. He intended to speak with the County's ADA coordinator but discovered that the County did not have an ADA coordinator.[3] He was directed to Mamie Pickett Brown, Veterans' Service Officer, who scheduled a meeting for plaintiff for the following week with her supervisor, Clarence Williams, Director of Human Capital Development. After the meeting, plaintiff and several of his colleagues from an advocacy group, Living Independence For Everyone, accompanied by Williams, Brown and a couple of other County officials, conducted a brief site survey at the courthouse. A November 16, 2012 report provided to the County detailed findings of accessibility barriers at the courthouse, including, among other things, a lack of accessible routes in most courtrooms to primary function areas (such as jury boxes, witness stands, litigant tables, bathrooms).

---

[3]     Under ADA regulations, a public entity with 50 or more employees is required to designate at least one responsible employee to coordinate ADA compliance. 28 C.F.R. pt. 35, § 35.107(a). The ADA Coordinator is responsible for coordinating the efforts of the government entity to comply with Title II and investigating any complaints that the entity has violated Title II. Id.

After presenting this report, plaintiff was invited to speak at a January 2013 meeting of the Board of Supervisors. He spoke at the meeting about the County's obligation under the ADA to make its programs, services and activities accessible to individuals with disabilities, and he urged the Board to move quickly to achieve compliance. The County did move quickly to hire an ADA coordinator, Tameka Moore. Once hired, Moore surveyed the courthouse and in January 2014, she provided a comprehensive report to the Board and to plaintiff identifying numerous accessibility issues at the courthouse.

During 2013 and 2014, plaintiff met and/or spoke several times with Moore and Williams, and a couple of times with Carmen Davis, County Administrator, and spoke at another meeting of the Board of Supervisors in June 2014. During these discussions, county officials promised him the County would make two of the courthouse's eight courtrooms (one large and one small) ADA-compliant as soon as possible and would thereafter work on making the remaining courtrooms compliant. This did not happen, however.

In June 2015, plaintiff returned to the courthouse in response to another summons for jury duty, to discover that nothing had been done; "[t]here were no differences at all." The east entrance doors were unchanged; the public restrooms remained inaccessible; and the courtrooms were the same as in 2012. Disappointed, frustrated and angry about the complete lack of

action by the County to address the accessibility issues, he wrote to Moore expressing this frustration and requesting a "hard timeline" for remedying specific accessibility issues. There is no evidence of any response to his letter.

In October 2015, the County hired a new ADA coordinator, George Nelson. Plaintiff sent Nelson an email in July 2016 with a link to an article regarding a settlement between the United States Department of Justice and the City of Milwaukee which required Milwaukee to modify it facilities to make them accessible by the disabled. Plaintiff wrote, "I haven't forgotten about the Hinds County Courthouse. We need to make TIMELY progress in bringing it into compliance with ADA." Nelson responded, stating, "I am in agreement with you and we are working diligently to address ADA compliance issues within Hinds County." But in a later phone call, Nelson told plaintiff the County had no immediate plans to, in plaintiff's words, "fix the courthouse." Upon hearing this, plaintiff decided to file the present action. In his complaint, filed February 21, 2017, plaintiff alleges that various architectural barriers prevent him from accessing the services, programs and activities offered at the courthouse. He asks the court to enjoin the County to bring the courthouse into full compliance with the ADA.

Standing

Article III, § 2, of the Constitution limits the federal courts to the adjudication of "Cases" and "Controversies." U.S.

Const. art. III, § 2, cl. 1; <u>Steel Co. v. Citizens for a Better</u>
<u>Env't</u>, 523 U.S. 83, 102, 118 S. Ct. 1003, 140 L. Ed. 2d 210
(1998).  To establish a "case or controversy," a plaintiff must
establish that he has standing.  <u>Legacy Cmty. Health Servs., Inc.</u>
<u>v. Smith</u>, 881 F.3d 358, 366 (5th Cir.), as revised (Feb. 1, 2018),
*cert. denied*, 139 S. Ct. 211, 202 L. Ed. 2d 126 (2018) (citing
<u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61, 112 S. Ct. 2130,
119 L. Ed. 2d 351 (1992)).  The doctrine of standing "serves to
identify those disputes" which qualify as "cases" or
"controversies" that may be "appropriately resolved through the
judicial process."  <u>Lujan</u>, 504 U.S. at 560, 112 S. Ct. 2130
(citation omitted).  In other words, the standing requirement
exists to ensure that "the plaintiff has 'alleged such a personal
stake in the outcome of the controversy' as to warrant his
invocation of federal-court jurisdiction and to justify exercise
of the court's remedial powers on his behalf."  <u>Warth v. Seldin</u>,
422 U.S. 490, 498–99, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)
(quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7
L. Ed. 2d 663 (1962)).  The question of standing is separate from
the merits of a case; "when considering whether a plaintiff has
Article III standing, a federal court must assume *arguendo* the
merits of his or her legal claim."  <u>North Cypress Medical Center</u>

Operating Co., Ltd. v. Cigna Healthcare, 781 F.3d 182, 191 (5th

Cir. 2015) (quotation marks and citation omitted).[4]

---

[4]     The court previously found that plaintiff had
demonstrated a lack of program accessibility.  The court has
reconsidered its earlier ruling on standing but remains of the
opinion that plaintiff has proven that jury service is not
accessible to disabled individuals at the Hinds County Courthouse.
Plaintiff has demonstrated that there are no readily accessible
restrooms for wheelchair users and that various architectural
barriers in most, if not all, of the eight courtrooms impede ready
access by wheelchair users to program areas.  The County's
position that there was no lack of program access as plaintiff was
able to fully participate in jury service is not well-founded.
See Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001) ("A
violation of Title II ... does not occur only when a disabled
person is completely prevented from enjoying a service, program,
or activity. ... If the Courthouse's wheelchair ramps are so steep
that they impede a disabled person or if its bathrooms are unfit
for the use of a disabled person, then it cannot be said that the
trial is 'readily accessible,' regardless whether the disabled
person manages in some fashion to attend the trial.").  And the
County plainly has not supported its putative defenses.  It claims
that modifications requested by plaintiff would impose an undue
financial burden and further, that in view of the courthouse's
designation as a historic landmark, any modification would impose
an undue financial burden and threaten historic preservation
interests.  It has not presented sufficient competent evidence to
substantiate either position.

Standing encompasses, at an "irreducible minimum", the following three essential elements:

> First and foremost, there must be alleged (and ultimately proved) an injury in fact — a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not "conjectural" or "hypothetical." Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury.

Steel Co., 523 U.S. at 103, 118 S. Ct. 1003 (internal citations and quotation marks omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," Spokeo, Inc. v. Robins, – U.S. –, 136 S. Ct. 1540, 1547-48, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016); and he must do so separately for each form of relief sought, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185, 120 S. Ct. 693, 706, 145 L. Ed. 2d 610 (2000); see also City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief).

Title II of the ADA authorizes plaintiffs to seek injunctive relief against public entities. See Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist., 385 F. Supp. 3d 491, 508 (E.D. La. 2019) (citing 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a)). "To obtain standing for injunctive relief, a plaintiff must show that there is reason to believe that

he would directly benefit from the equitable relief sought."
Plumley v. Landmark Chevrolet, Inc., 122 F.3d 308, 312 (5th Cir.
1997) (citing Hoepfl v. Barlow, 906 F. Supp. 317, 321 (E.D. Va.
1995)).  Even if he has previously encountered illegal conduct, he
does not have standing to secure an injunction "if there are no
'continuing, present adverse effects.'"  Deutsch v. Travis Cty.
Shoe Hosp., Inc., 721 F. App'x 336, 340 (5th Cir. 2018) (quoting
Lujan, 504 U.S. at 564, 112 S. Ct. 2130).  See Lyons, 461 U.S. at
110, 1-03 S. Ct. 1660 ("[p]ast wrongs do not in themselves amount
to that real and immediate threat of injury necessary to make out
a case or controversy.").  To have standing, he must prove that he
"face[s] a threat of present or future harm."  Plumley, 122 F.3d
at 312.  The threatened injury must be "'concrete and
particularized' and 'actual or imminent, not conjectural or
hypothetical.'"  Crane v. Johnson, 783 F.3d 244, 251-52 (5th Cir.
2015) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149,
158, 134 S. Ct. 2334, 2341, 189 L. Ed. 2d 246 (2014)).  See also
Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 133 S. Ct. 1138,
1147, 185 L. Ed. 2d 264 (2013) (quoting Whitmore v. Arkansas, 495
U.S. 149, 158, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990))
(stating that "'threatened injury must be *certainly impending* to
constitute injury in fact'"; "'[a]llegations of *possible* future
injury' are not sufficient."); Hainze v. Richards, 207 F.3d 795,

802 (5th Cir. 2000) (holding that plaintiff must demonstrate "a real or immediate threat that he will be wronged again").

An ADA plaintiff can satisfy his burden to demonstrate the requisite likelihood of future injury either by showing that he intends to return to the facility at issue and is consequently likely to reencounter a discriminatory architectural barrier, see Gilkerson v. Chasewood Bank, 1 F. Supp. 3d 570, 582 (S.D. Tex. 2014), or, alternatively, by showing that he is deterred from visiting the subject facility by the presence of discriminatory architectural barriers, see Betancourt v. Federated Dep't Stores, 732 F. Supp. 2d 693, 708 (W.D. Tex. 2010) ("The fact that the disabled person is being deterred from visiting an establishment they would otherwise visit, even if infrequently, is an ongoing, present injury."); see also Frame v. City of Arlington, 657 F.3d 215, 236 (5th Cir. 2011)(citing 42 U.S.C. § 12188(a)(1) ("[A] person with a disability [need not] engage in a futile gesture if such person has actual notice that a person or organization covered by [the ADA] does not intend to comply with its provisions")). Thus, courts have "Article III jurisdiction to entertain requests for injunctive relief both to halt the deterrent effect of a noncompliant accommodation and to prevent imminent 'discrimination,' as defined by the ADA, against a disabled individual who plans to visit a noncompliant

accommodation in the future." Chapman v. Pier 1 Imports (U.S.)
Inc., 631 F.3d 939, 950 (9th Cir. 2011) (citations omitted).

A plaintiff seeking to establish standing based on an intent
to return to a place does not sustain his burden by a mere
"profession of an 'intent' to return...." Lujan, 504 U.S. at 564.
Rather, he must prove facts which show that he intends, and is
likely, to return. Gilkerson, 1 F. Supp. 3d at 582. Moreover,
proof of that intent must be reasonably specific; "mere 'some day
intentions — without any description of concrete plans, or indeed
even any specification of when the some day will be—do not support
a finding of the actual or imminent injury.'" Deutsch, 721 Fed.
Appx. at 340 (quoting Lujan, 504 U.S. at 564). Ultimately, if the
proof shows that plaintiff "'is indifferent to returning to the
[facility],' 'if his alleged intent to return is not genuine,' or
if 'he is not reasonably likely to encounter' the barriers at
issue", then he will not have standing based on any putative
intent to return. Twede v. Univ. of Washington, 309 F. Supp. 3d
886, 894 (W.D. Wash. 2018) (quoting Chapman, 631 F.3d at 953).

Plaintiff herein does not contend that any accessibility
barriers have deterred him from returning to the courthouse.
Instead, he contends he has standing based on his intent to return
to the courthouse. However, he does not claim that he intends or
expects to return for the purpose of accessing any programs,

services or activities at the courthouse.[5] Rather, he asserts that he intends to return to the courthouse as an ADA "tester", that is, to test the County's compliance with the ADA and Rehabilitation Act.

Courts considering the issue have found that testers can have standing to secure injunctive relief under the ADA and the Rehabilitation Act. See Griffin v. Dep't of Labor Fed. Credit Union, 912 F.3d 649, 656 (4th Cir. 2019) ("It is true that tester status does not destroy standing.") (citation omitted); Gaylor v. Hamilton Crossings CMBS, 582 F. App'x 576, 579-81 (6th Cir. 2014) (finding the plaintiff had tester standing under ADA Title III); Tandy v. City of Wichita, 380 F.3d 1277, 1287 (10th Cir. 2004)

---

[5] There is one exception. Plaintiff attended a meeting of the Board of Election Commissioners in May 2018 and indicated that he intends to attend additional meetings of this board. However, even if his expression of this intent were sufficiently concrete, it would not support a finding of standing because standing is analyzed from the facts as they existed at the time the complaint was filed. See Harris v. Stonecrest Care Auto Ctr., LLC, 472 F. Supp. 2d 1208, 1217 (S.D. Cal. 2007) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 191, 120 S. Ct. 693, 709, 145 L. Ed. 2d 610 (2000)) (in determining whether, at the time of filing, plaintiff was likely to return, court did not consider evidence that plaintiff visited the subject establishment after filing suit).

By mere happenstance, plaintiff was summoned for jury duty in May 2018, after this suit was filed. The court acknowledges that plaintiff could possibly be summoned again for jury duty. However, that mere possibility is not sufficient to confer standing. See Hummel v. St. Joseph Cty. Bd. of Comm'rs, 817 F.3d 1010, 1021 (7th Cir. 2016) (finding that while there was a chance that the plaintiffs would be called to serve as jurors at some point, "[t]he prospect of jury service [is] too speculative to support standing to challenge juror facilities" as violative of Title II of the ADA).

(holding that tester standing exists under Title II of the ADA and the Rehabilitation Act); Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332 (11th Cir. 2013) (Title III); see also Deutsch v. Travis Cty. Shoe Hosp., Inc., No. A-15-CV-1198 LY, 2016 WL 5317199, **1-2 (W.D. Tex. Sept. 21, 2016), aff'd in part and remanded, 721 F. App'x 336, 340 (5th Cir. 2018) (stating that "there is no doubt that a 'tester' plaintiff can have standing under the ADA").  There is some question as to whether a plaintiff whose *sole* purpose in visiting a place is to test for ADA compliance has standing to sue for injunctive relief.  See Griffin, 912 F.3d at 656 (finding that tester plaintiff had no standing where he had "'no particular reason'—other than his role as a tester, which alone is insufficient—to ever return."); Norkunas v. Park Rd. Shopping Ctr., Inc., 777 F. Supp. 2d 998, 1005 (W.D.N.C. 2011), aff'd, 474 F. App'x 369 (4th Cir. 2012) (concluding that "the naked assertion of a desire to return to a defendant establishment for the sole purpose of confirming ADA-compliance, without more, is insufficient to establish standing."); but see Houston, 733 F.3d at 1334 (holding that "'bona fide patron' status is a not a prerequisite ... to obtain standing for a lawsuit under" pertinent Title III provisions). In all events, though, a tester plaintiff seeking injunctive relief, just as any plaintiff, must show that he faces a real and immediate threat of future injury.  Tandy, 380 F.3d at 1287; see

18

also <u>Houston</u>, 733 F.3d 1323, 1336 (11th Cir. 2013) (holding that tester status, without more, was insufficient to show threat of future injury).  This means that plaintiff herein must demonstrate that at the time he filed suit, he intended to return to the courthouse (even if for no other purpose than to test for ADA compliance).  <u>See</u> <u>Griffin</u>, 912 F.3d at 656 (stating that a plaintiff's tester status "cannot create standing in the absence of an otherwise plausible assertion" that he intends to return to the place at issue); <u>see</u> <u>also</u> <u>Tandy</u>, 380 F.3d at 1287 (finding that tester plaintiff had sufficiently alleged standing to obtain prospective relief where he averred an intent to use the defendant city's fixed-route bus services several times per year and thus faced real and immediate threat of future injury); <u>Houston</u>, 733 F.3d 1323, 1336 (11th Cir. 2013) (finding that tester plaintiff had standing as his assertion that he would return to the ADA-noncompliant supermarket was plausible based on evidence that he passed the defendant store "regularly" on his trips to Miami-Dade County, but noting that facts might "demand a different conclusion if the plaintiff "live[d] hundreds of miles away from the store with no particular reason to return").

In the case at bar, plaintiff declared in an affidavit submitted to the court in response to Hinds County's summary judgment motion that he planned to visit the Hinds County Courthouse "in the future as an ADA tester to determine whether

the barriers have been removed or ADA compliance has been achieved by adequate accommodations." The court previously accepted this statement as true on its face. A more probing consideration of the facts of record leads the court to conclude that the evidence, fairly viewed, belies plaintiff's professed intent to return.

Plaintiff first complained to Hinds County in October 2012 about accessibility issues he encountered during his two days of jury selection. He advocated for action; he and his colleagues prepared a survey/plan; he twice appeared before the Board of Supervisors; he had conversations with County officials for two years and secured promises that action would be taken. But through all of this, he never actually went to the courthouse to check on the County's progress. He did go the courthouse once, in June 2015, but only because he was summoned for jury duty. When he discovered on that visit that despite its promises, the County had taken no action, he complained again and requested action. A year later, he told ADA Coordinator Nelson via email that he "[hadn't] forgotten" about the courthouse and that "timely" action was needed. Nelson responded that the County was "working diligently to address ADA compliance issues...." But months went by and plaintiff still did not return to the courthouse. Ultimately, he filed this lawsuit, not because he went to the courthouse as a "tester" to see what the County had done to address accessibility issues but because Nelson admitted in a

phone call that the County had no plans to "fix the courthouse". In sum, in the more than four years between the time plaintiff first complained about the courthouse and the time he filed suit, plaintiff returned to the courthouse only once – and that was not to test for compliance but for jury service.

Conclusion

The court does not doubt the sincerity of plaintiff's interest in the County's compliance with its obligation under the ADA to ensure that programs, services and activities it operates at the courthouse are readily accessible to and usable by individuals with disabilities.  However, as nothing in his actions suggests to the court that plaintiff had a genuine intent to return to the courthouse for any purpose, the court concludes that plaintiff lacks standing to obtain injunctive relief because he has not proven that he faces an immediate and real threat of future injury.

Accordingly, it is ordered that plaintiff's claim for injunctive relief is denied.[6]

SO ORDERED this 8th day of October, 2019.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

_____

[6]    The court acknowledges that plaintiff has filed a motion for attorney's fees based on his contention that he is the prevailing party in this litigation in light of the settlement of his damages claim.  That motion remains pending for resolution.